**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 19-cr-329 (BAH)** |
| | : | |
| **DANIELLE PREIDT,** | : | <u>**UNDER SEAL**</u> |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE**
<u>**AND MEMORANDUM IN AID OF SENTENCING**</u>

The United States of America, by and through the United States Attorney for the District

of Columbia, respectfully submits its Memorandum in Aid of Sentencing.



The government respectfully submits that such a

sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a).   In

support of this motion, and to assist the Court in fashioning an appropriate sentence, the

Government submits the following:

## FACTUAL AND PROCEDURAL BACKGROUND

As detailed in the Statement of Offense and Related Conduct, the defendant was recruited into two money laundering conspiracies organized by Michael Afram Orji (Orji) and by the co-conspirator known to her only by his nicknames (CO-CONSPIRATOR 2).   Acting under the direction of her co-conspirators, the defendant incorporated sham corporations and opened fraudulent bank accounts in the D.C. region and elsewhere, used false IDs provided to her, and deposited and laundered the stolen checks and other fraud proceeds.   The defendant's conspiracy with Orji lasted from approximately June 2017 through December 2017 and involved $862,865.26 in stolen checks and business email compromise (BEC) schemes.   The defendant's overlapping conspiracy with CO-CONSPIRATOR 2 lasted from approximately June 2017 through April 2018 and involved $7,003,335.45 in stolen checks and BEC schemes.

### I. Offense Conduct

The defendant became acquainted with both Orji and CO-CONSPIRATOR 2 at a nightclub in the District of Columbia.   She was introduced to Orji through a mutual acquaintance.   Orji and CO-CONSPIRATOR 2 were part of the same social circle, but to the defendant's knowledge, they did not work together in their criminal activities.   CO-CONSPIRATOR 2 initially pursued a romantic relationship with the defendant, but she was not interested.   CO-CONSPIRATOR 2 then offered to help the defendant make money by participating in fraud and money laundering schemes.   CO-CONSPIRATOR 2 provided the defendant with the tools of the trade—including false IDs and identity information, business registration paperwork, and stolen checks—and instructed her on how to deposit and launder fraud proceeds.   The defendant's first scheme with CO-CONSPIRATOR 2, however, failed after the check failed to go through.

After working with CO-CONSPIRATOR 2 unsuccessfully, the defendant approached Orji and began working with him in a similar capacity.   Eventually, the defendant's conspiracies with CO-CONSPIRATOR 2 and Orji both began to bear fruit, as described in further detail below. The defendant used numerous false aliases and forged driver's licenses in furtherance of these conspiracies, including aliases in the names of K.S., K.A., C.W., R.U., M.F., M.S., A.J., K.J., K.J., K.J., C.S., T.J., and M.S., among others.   The defendant generally used these false aliases and forged driver's licenses to establish bank accounts that were used to facilitate bank fraud and to launder criminal fraud proceeds.

### A.  Money Laundering Conspiracy Involving Orji

#### i.  Danimeal Real Estate LLC and Rippon Investment Realty (VICTIM 1)

On or about July 7, 2017, the defendant established a Maryland corporation in the name of Danimeal Real Estate LLC, using her true name.   On or about July 12, 2017, the defendant opened Citibank account number ending in 7704 ("Citibank Account 7704") in the name of Danimeal Real Estate LLC, also using the defendant's true name.   The defendant was acting at the direction of Orji in establishing Citibank Account 7704.   The defendant provided Orji with the account information for Citibank Account 7704.

On or about August 10, 2017, the defendant opened SunTrust account number ending in 7407 ("SunTrust Account 7407") in the name of Rippon Investment Realty, using the false alias K.S.   The defendant was acting at the direction of Orji in establishing SunTrust Account 7407. A copy of a fraudulent driver's license in the name of K.S., bearing the defendant's photograph, was later found in Orji's residence during the execution of a search warrant.

VICTIM 1 is a public school system in a U.S. city.   On or about September 8, 2017, VICTIM 1 was fraudulently induced into making an ACH payment in the amount of $478,440.69 into an account that Orji had previously established in the name of Rippon Transportation at BB&T, account number ending in 3627 ("BB&T Account 3627").

The defendant then used SunTrust Account 7407, held in the name of Rippon Investment Realty, to launder the fraud proceeds obtained by Orji from VICTIM 1.

On or about September 10, 2017, the defendant used WhatsApp to send a photograph with the name and address for Rippon Investment Realty to Orji.   The defendant stated: "This is the name of the business we registered."

On or about September 11, 2017, Orji used WhatsApp to send the defendant the following message: "Deposit the suntrust under the name [K.S.] into account [redacted account number ending in 7407].   Take a pic of the check after you've written it out."   Orji's message referred to the defendant's Suntrust Account 7407, held in the name of Rippon Investment Realty and the defendant's false alias, K.S.

Further on or about September 11, 2017, the defendant responded, using WhatsApp, with photographs of the front and back of a check in the amount of $91,530.47.   The check was drawn on Orji's BB&T Account 3627 in the name of "Rippon Transportation – General Account," the account that had just received the fraudulently-induced $478,440.69 ACH payment from VICTIM 1.   The check was signed by C.L., an alias used by Orji, and it was made payable to K.S., the defendant's alias.

Further on or about September 11, 2017, the defendant deposited the check into the defendant's SunTrust Account 7407, held in the name of Rippon Investment Realty.   The check

was funded by fraud proceeds obtained from VICTIM 1.   The defendant used WhatsApp to send a photograph of the check deposit slip to Orji.

Following the deposit of that $91,530.47 check, derived from the fraud proceeds obtained from VICTIM 1, the defendant rapidly liquidated the proceeds in SunTrust Account 7407 through cash withdrawals in the District of Columbia and elsewhere, debit purchases, and large checks. One of the purposes of these transactions was to conceal or disguise the nature, location, source, ownership, and/or control of the fraud proceeds.

On or about September 20, 2017, the defendant purchased a cashier's check in the amount of $65,000.00, drawn on SunTrust Account 7407 and made payable to "Horse Shoe Casino Baltimore."

On or about September 21, 2017, the defendant used the false alias of K.S. to establish an account at Horseshoe Casino in Baltimore, Maryland, and deposited the above-referenced $65,000.00 cashier's check.   Minutes after depositing the check, on or about September 21, 2017, the defendant withdrew $40,000.00 in cash from Horseshoe Casino.   On or about September 22, 2017, the defendant further withdrew $25,000.00 in cash from Horseshoe Casino.   The purpose of these casino transactions was to "clean," or launder, the funds.   The defendant kept $10,000.00 and returned the balance, $55,000.00, to Orji.

The defendant also used Citibank Account 7704, held in the name of Danimeal Real Estate LLC, to launder fraud proceeds obtained by Orji from VICTIM 1.

On or about September 11, 2017, Orji deposited a check in the amount of $87,421.10, drawn on BB&T Account 3627 and derived from the fraud proceeds obtained from VICTIM 1, into the defendant's Citibank Account 7704.

Following the deposit of that $87,421.10 check into Citibank Account 7704, the account was rapidly drained through transactions including a cash withdrawal in the amount of $7,500.00 and a cashier's check in the amount of $40,000.00 made payable to W.B.   One of the purposes of these transactions was to conceal or disguise the nature, location, source, ownership, and/or control of the fraud proceeds.   W.B. was one of Orji's false aliases.   The above-referenced cashier's check in the amount of $40,000.00 was later cashed at a casino in Maryland.

### ii.   The T.J. Account (VICTIM 2)

On or about October 16, 2017, the defendant opened Regions Bank account number ending in 1190 ("Regions Bank Account 1190"), using the false alias of T.J.   The defendant was acting at the direction of Orji in establishing Regions Bank Account 1190.

On or about October 16, 2017, the defendant used WhatsApp to send a message to Orji stating: "So they're acting like I can't open because this is is Pennsylvania iD [sic]."   Orji responded: "That's why the south Carolina would be so much better, but he spelled [J.] wrong."

Further on or about October 16, 2017, the defendant asked Orji via WhatsApp: "Address / ?"   Orji responded with an address in Montgomery, Alabama, and stated: "Address for [T.]." The same address in Montgomery, Alabama was used to register Regions Bank Account 1190.

Further on or about October 16, 2017, Orji asked the defendant via WhatsApp: "Do you remember [T.'s] ss?"   The defendant responded with a Social Security Number.   Orji then stated: "Ok just wanted to make sure you were ol / Ok."   The same Social Security Number was used to register Regions Bank Account 1190.

On or about October 19, 2017, the defendant deposited a stolen check in the amount of $205,612.79 from VICTIM 2 into Regions Bank Account 1190.   However, the defendant was unsuccessful in withdrawing any proceeds from the account.

### iii.  Beard Mechanical Contractors (VICTIM 3)

On or about November 14, 2017, the defendant opened First Citizens Bank account number ending in 2282 ("First Citizens Account 2282") in the name of Beard Mechanical Contractors, using the false alias of M.S.   The defendant was acting at the direction of Orji in establishing First Citizens Account 2282.

On or about November 16, 2017, the defendant deposited a stolen check in the amount of $155,503.00 from VICTIM 3 into First Citizens Account 2282.   However, First Citizens Bank placed a hold on the check before any further transactions could be completed.

### iv.  BRE DDR BR Fairlane MI LLC and Alex Scientific Lab Devices (VICTIM 4)

On or about September 5, 2017, the defendant opened BB&T bank account number ending in 3262 ("BB&T Account 3262") in the name of Alex Scientific Lab Devices, using the false alias of K.S.   The defendant was acting at the direction of Orji in establishing BB&T Account 3262. The defendant used WhatsApp to send photographs of the account opening paperwork and online bank access for BB&T Account 3262 to Orji.

On or about September 8, 2017, the defendant used WhatsApp to send Orji the name of a new alias, K.A., and certain identifying information including birthdate and e-mail address corresponding to the K.A. alias.   The defendant further stated, "That's a new name."

On or about November 13, 2017, the defendant opened TD Bank account number ending in 6036 ("TD Bank Account 6036") in the name of BRE DDR BR Fairlane MI LLC, using the

false alias of K.A.   The defendant was acting at the direction of Orji in establishing TD Bank Account 6036.

On or about November 15, 2017, a check in the amount of $23,308.84, drawn on the account of VICTIM 4 and payable to BRE DDR BR Fairlane MI LLC, was deposited into TD Bank Account 6036.

Orji was arrested in the District of Columbia on or about November 20, 2017.   Shortly after his arrest, on or about November 20, 2017, Orji initiated a telephone call from the D.C. Department of Corrections to the same mutual acquaintance who had originally introduced the defendant to Orji.   Orji told this person to contact a then-unknown female co-conspirator, whom Orji referred to as "D" or "Danielle" from Baltimore.   Orji provided the following instructions to the third party about the defendant and another co-conspirator ("CC-B"):

> Orji:   Yeah, when you talk to her, just let her know everything's good, she should still do what she's doing, just make sure she check everything and tell her to send you a screenshot to your WhatsApp, of everything, like you know. . . . I'll explain everything when I see you, just tell her that everything's still good, that she should just check the stuff on Wednesday. If everything is good, you know, she should just proceed as, what's it called. Once you tell her that, you know, everything is good.   [CC-B] gave her some work to do, you know.   I was supervising. . . . There's some money still, there's some money still that she's, she just needs to, you know, communicate with you and [CC-B].   Give her [CC-B's] number, so [CC-B], so you don't have to talk to, you know, just tell [CC-B] to talk to her, and what's it called, I'ma make sure everything, he going to run everything through her.

On or about November 26, 2017, Orji initiated another telephone call from the D.C. Department of Corrections to the same third party, who connected the defendant into the call by means of a three-way connection.   During this call, Orji asked the defendant about the above-referenced bank account in the name of Alex Scientific Lab Devices and the defendant's false alias

K.S., referring to "that Alex . . . that was for [K.], right, that was for [K.], right?"   The defendant responded that, "It's good, it's good."   Orji then instructed the defendant to "just keep running them," referring to the bank accounts.

On or about December 12, 2017, the defendant deposited a check in the amount of $22,794.00, drawn on TD Bank Account 6036 and derived from the fraud proceeds obtained from VICTIM 4, into the BB&T Account 3262 in the name of Alex Scientific Lab Devices.   The check was signed, "K. [A.]," matching the defendant's false alias K.A.   One of the purposes of this transaction was to conceal or disguise the nature, location, source, ownership, and/or control of the fraud proceeds.   The defendant was unsuccessful in obtaining funds from the above-referenced check deposit.

### B.  Money Laundering Conspiracy Involving CO-CONSPIRATOR 2

### i.  SWA Balsley Landscape Architects LLC

#### *Overview*

In this scheme, a BEC scheme fraudulently induced VICTIM 5 into mistakenly sending more than $6.8 million to an account opened and controlled by a third-party co-conspirator who was part of CO-CONSPIRATOR 2's conspiracy.   As part of the laundering process, this co-conspirator wrote two checks from the BEC proceeds, in the amounts of $102,672.86 and $163,288.52, and the defendant deposited and attempted to launder the two checks.

As described below, the first check was frozen almost immediately.   Through the course of the investigation, law enforcement obtained a seizure warrant and was able to return the proceeds to VICTIM 5.

The second check was successfully laundered.   Seeing that the defendant's SWA Balsley Landscape Architects LLC account remained active and had not been shut down by the bank, CO-CONSPIRATOR 2 provided the defendant with a stolen check from another victim, VICTIM 6, to deposit and launder.

### *Accounts*

On or about December 22, 2017, a co-conspirator opened Wells Fargo account number ending in 7842 ("Wells Fargo Account 7842") in the name of Hubei Granules-Biocause Pharmaceuticals, LLC.

On or about March 27, 2018, the defendant opened BB&T account number ending in 9408 ("BB&T Account 9408") in the name of International Paper LLC, using the false alias of C.S. CO-CONSPIRATOR 2 provided a false driver's license in the name of C.S. to the defendant for purposes of establishing the account.   The defendant was acting at the direction of CO-CONSPIRATOR 2 in opening the bank account.

On or about April 4, 2018, in the District of Columbia, the defendant opened Bank of America account number ending in 5945 ("Bank of America Account 5945") in the name of SWA Balsley Landscape Architects LLC, using another false alias, C.W.   The defendant was acting at the direction of CO-CONSPIRATOR 2 in opening the bank account.

### *BEC Scheme Targets VICTIM 5*

On or about April 5, 2018, VICTIM 5 was fraudulently induced into making an ACH payment in the amount of $1,831,645.61 into Wells Fargo Account 7842, held by a co-conspirator in the name of Hubei Granules-Biocause Pharmaceuticals, LLC.   Subsequently, VICTIM 5 was fraudulently induced into making two additional ACH payments into Wells Fargo Account 7842:

$1,222,963.04 on or about April 13, 2018; and $3,882,035.69 on or about April 17, 2018.   In total, VICTIM 5 was induced into making three fraudulent ACH payments totaling $6,836,634.34.

Following the first fraudulent ACH payment from VICTIM 5, a co-conspirator issued checks from the Wells Fargo Account 7842 account to accounts under the defendant's control, including: one check payable to International Paper LLC in the amount of $102,672.86; and one check payable to SWA Balsley Landscape Architects LLC in the amount of $163,288.52.   CO-CONSPIRATOR 2 provided the two above-referenced checks to the defendant.

### *Defendant Launders $266,961.36 in BEC Proceeds*

On or about April 5, 2018, the defendant deposited the above-referenced check in the amount of $102,672.86 into BB&T Account 9408, held in the name of International Paper LLC. However, BB&T placed a hold on the check before any further transactions could be completed.

Further on or about April 5, 2018, the defendant deposited the above-referenced check in the amount of $163,288.52 into Bank of America Account 5945, held in the name of SWA Balsley Landscape Architects LLC.

Following the deposit of that check, derived from the fraud proceeds obtained from VICTIM 5, the defendant, acting at the direction of CO-CONSPIRATOR 2, rapidly drained the account through transactions including cash withdrawals in the District of Columbia and elsewhere, cashier's checks, and wire transfers.   One of the purposes of these transactions was to conceal or disguise the nature, location, source, ownership, and/or control of the fraud proceeds.

Among the transactions were two wire transfers in the amounts of $68,921.00 and $39,572.52 to COMPANY 1, which sells gold and other precious metals.   CO-CONSPIRATOR 2 instructed the defendant to purchase untraceable gold from COMPANY 1.   At least one

shipment of gold was delivered to the defendant in the District of Columbia.   The defendant signed for the shipment using her false alias, C.W.   The defendant then delivered the gold to CO-CONSPIRATOR 2 in the District of Columbia in exchange for approximately $5,000 in cash.

In addition, on or about April 12, 2018, using fraud proceeds from VICTIM 5, the defendant obtained a cashier's check in the amount of $5,580.75, payable to M.S.   On or about April 16, 2018, using fraud proceeds from VICTIM 5, the defendant obtained a cashier's check in the amount of $5,678.25, payable to M.F.   Both M.S. and M.F. were false aliases used by the defendant.

In addition, on or about April 24, 2018, the defendant deposited a stolen check in the amount of $62,002.56 from VICTIM 6 into Bank of America Account 5945.   CO-CONSPIRATOR 2 provided the check from VICTIM 6 to the defendant.   Following this deposit, the defendant continued draining the account through cash withdrawals and other transactions.

### ii.  Southern Botanical LLC

On or about February 1, 2018, the defendant opened Bank of America account number ending in 8540 ("Bank of America Account 8540") in the name of Southern Botanical LLC, using the false alias A.J.   CO-CONSPIRATOR 2 provided a false driver's license in the name of A.J. to the defendant for purposes of establishing the account.   The defendant was acting at the direction of CO-CONSPIRATOR 2 in opening the bank account.

On or about February 2, 2018, the defendant deposited a stolen check drawn on the account of VICTIM 7 in the amount of $14,529.90 into Bank of America Account 8540.   CO-CONSPIRATOR 2 provided the check from VICTIM 7 to the defendant.

On or about February 14, 2018, the defendant deposited a stolen check drawn on the account of VICTIM 8 in the amount of $21,548.31 into Bank of America Account 8540.   CO-CONSPIRATOR 2 provided the check from VICTIM 8 to the defendant.

Following the deposits of the above-referenced stolen checks, the defendant, acting at the direction of CO-CONSPIRATOR 2, made ATM withdrawals and other cash withdrawals from Bank of America Account 8540, including withdrawals totaling $15,940.00 on or about February 26, 2018.   One of the purposes of these transactions was to conceal or disguise the nature, location, source, ownership, and/or control of the fraud proceeds.

### iii.  International Paper LLC

On or about March 30, 2018, the defendant opened M&T Bank account number ending in 9344 ("M&T Account 9344") in the name of International Paper LLC, using the false alias of C.S. CO-CONSPIRATOR 2 provided a false driver's license in the name of C.S. to the defendant for purposes of establishing the account.   The defendant was acting at the direction of CO-CONSPIRATOR 2 in opening the bank account.

On or about April 3, 2018, the defendant deposited a stolen check drawn on the account of VICTIM 9 in the amount of $43,370.34 into M&T Account 9344.

Following the deposit of the above-referenced stolen check, the defendant, acting at the direction of CO-CONSPIRATOR 2, issued a check from M&T Account 9344 in the amount of $30,071.12, payable to BONM Global LLC.   BONM Global LLC was an entity controlled by CO-CONSPIRATOR 2.   One of the purposes of this transaction was to conceal or disguise the nature, location, source, ownership, and/or control of the fraud proceeds.

### iv.  Bradley Construction Services, LLC

On or about April 6, 2018, in the District of Columbia, the defendant opened Bank of America account number ending in 7927 ("Bank of America Account 7927") in the name of Bradley Construction Services, LLC, using the false alias of R.U.   When opening Bank of America Account 7927, the defendant provided a stolen Social Security Number corresponding to a real individual, IDENTITY THEFT VICTIM A.

On or about April 11, 2018, the defendant deposited a check drawn on the account of VICTIM 10 in the amount of $25,250.00 into Bank of America Account 7927.   The check was originally made payable to a different entity, but the check was altered to appear payable to "Bradely [sic] Construction Services."

Following the deposit of that check, the defendant and/or co-conspirators rapidly drained the account through transactions including ATM withdrawals in the District of Columbia and elsewhere, debit purchases, and multiple cashier's checks.   One of the purposes of these transactions was to conceal or disguise the nature, location, source, ownership, and/or control of the fraud proceeds.

After completing the above-referenced transactions that occurred on or about April 24, 2018 at one Bank of America branch in the District of Columbia, including cash withdrawals and the cashier's check to M.F., the defendant went to a different Bank of America branch, also located in the District of Columbia.   There, the defendant presented a false driver's license in the name of M.F. and cashed the above-referenced cashier's check in the amount of $4,387.25.

On or about April 25, 2018, after obtaining the above-referenced cashier's check in the amount of $5,180.50, the defendant attempted to make another withdrawal from the same account.

14

However, a bank teller called 911.   Officers from the Metropolitan Police Department (MPD) responded and arrested the defendant before any further transactions could be completed.

**II.  Procedural History**

The defendant was initially identified in early 2018 by law enforcement as a result of Orji's incriminating jail calls with "Danielle" in November 2017, in which he instructed "Danielle" to continue running money laundering schemes that she and Orji had begun before his arrest.   When agents executed a search warrant on Orji's residence, they also found multiple false IDs bearing the photograph of a then-unidentified female, who was later identified as the defendant.   By coincidence, just as federal law enforcement was beginning to focus on the defendant, she was arrested by MPD on April 25, 2018 in the middle of the Bradley Construction Services money laundering scheme with CO-CONSPIRATOR 2.   The defendant was charged in D.C. Superior Court with Identity Theft in the 1st Degree and retained counsel.



15

On October 11, 2019, the defendant entered a guilty plea ███████████████████

██████████████████████████████████████ The defendant pled guilty to an Information

charging two counts of conspiracy to launder monetary instruments, in violation of 18 U.S.C.

§ 1956(h), covering her separate conspiracies with Orji and with CO-CONSPIRATOR 2.

Among other things, the charges in this Court incorporated the defendant's participation in the

Bradley Construction Services scheme. █████████████████████████



on August 28, 2019, FBI and FDIC-OIG obtained a sealed seizure warrant for $102,711.32 from the defendant's International Paper LLC bank account.   These were the only remaining proceeds from the $6.8 million BEC scheme targeting VICTIM 5.   After administrative forfeiture proceedings, the seized funds were returned to VICTIM 5 in partial compensation for its losses.[2]



---

[2] The government understands that VICTIM 5 agreed to split its out-of-pocket losses from the BEC scheme with the counterparty on the other side of the transaction, *i.e.* the legitimate party VICTIM 5 mistakenly believed it was paying.   When the $102,711.32 was recovered, VICTIM 5 split its recovery with the same counterparty.   The government's restitution recommendation reflects these adjustments.



## SENTENCING CALCULATION

### I. Statutory Maximums and Mandatory Minimums

A violation of Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h) and predicated on conspiracy to violate 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957, carries a maximum sentence of 20 years of imprisonment; a fine of $500,000 or twice the value of the property involved in the transaction, pursuant to 18 U.S.C. § 1956(a)(1); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

The Court must also impose a $100 special assessment under 18 U.S.C. § 3013. Additionally, U.S.S.G. § 5E1.2 indicates that the Court may impose a fine that is sufficient to pay

the federal government the costs of any imprisonment, term of supervised release, and period of probation.

## II. Sentencing Guidelines Calculation

The Final Presentence Investigation Report ("PSR") calculated the defendant's Guidelines as summarized below.   Counts One and Two are grouped together pursuant to U.S.S.G. § 3D1.1(a)(1) and 3D1.2(d), because the offense level is determined largely on the basis of the total amount of harm or loss.   Applying the aggregated quantity of loss under both counts pursuant to § 3D1.3(b), the defendant's offense level is calculated as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2S1.1(a)(1) | Base offense level (see underlying offense) | |
| U.S.S.G. § 2B1.1(a)(2) | Base offense level for Bank Fraud | 7 |
| U.S.S.G. § 2B1.1(b)(1)(J) | More than $3,500,000 | +18 |
| U.S.S.G. § 2B1.1(b)(10)(C) | Sophisticated means (Bank Fraud) | +2 |
| U.S.S.G. § 2B1.1(b)(11)(C)(i) | Unauthorized use of ID to produce or obtain other means of ID[3] | +2 |
| U.S.S.G. § 2S1.1(b)(2)(B) | Convicted of § 1956 | +2 |
| U.S.S.G. § 2S1.1(b)(3) | Sophisticated laundering | +2 |
| U.S.S.G. § 3B1.2(b) | Mitigating role: minor participant | -2 |
| | **Subtotal** | **31** |
| U.S.S.G. § 3E1.1 | Acceptance of responsibility | -3 |
| | **Adjusted total** | **28** |

---

[3] This sentencing enhancement was not contemplated by the parties at the time of the Plea Agreement or included in the Plea Agreement's estimated Guidelines analysis.   Pursuant to ¶ 6 of the Plea Agreement, the government is allowed "to address the correctness of any Sentencing Guidelines calculations determined by the presentence report writer or the court, even if those calculations differ from the Estimated Guidelines Range calculated herein," and "to answer any related inquiries from the Court or the presentence report writer" if "the Court or the presentence report writer considers any Sentencing Guidelines adjustments, departures, or calculations different from those agreed to and/or estimated in this Agreement."   In accordance with ¶ 6 of the Plea Agreement, the government acknowledges that § 2B1.1(b)(11)(C)(i) appears to apply to the facts of the case.   Specifically, CO-CONSPIRATOR 2 provided the defendant with a stolen Social Security Number from IDENTITY THEFT VICTIM A, which the defendant used to establish one of the bank accounts used in the conspiracy.   *See* Statement of Offense, ¶ 55.

The PSR calculated the defendant's criminal history score to be 1, placing her in Criminal History Category I.[4]

Based on an offense level of 28 and a criminal history category of I, the pre-departure Guideline range is 78-97 months of imprisonment.

## SENTENCING RECOMMENDATION

### I. Sentencing Factors

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory.   However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007). Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *Id.* at 49.

Next, the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).   *Id.* at 49-50.   The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).   *United States v. Rita*, 551 U.S. 338, 347-351 (2007).   The § 3553(a) factors include, *inter alia*, the nature

---

[4]  The U.S. Sentencing Commission recently enacted Amendment 821 to the Sentencing Guidelines, effective November 1, 2023.   Among other things, the Commission enacted the new § 4C1.1 (Adjustment for Certain Zero-Point Offenders), which provides for a 2-level decrease in offense level if the defendant has zero criminal history points under Chapter Four, Part A and meets additional criteria.   *See* U.S.S.G. § 4C1.1(a)(1)-(10).   Here, however, the defendant is ineligible for the 2-level decrease because she received 1 criminal history point from her 2013 misdemeanor theft conviction.

and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a)(1)-(7).

### A.  The Nature and Circumstances of the Offense

The defendant engaged in a series of significant bank fraud and money laundering schemes under the direction of Orji and CO-CONSPIRATOR 2.   These schemes were sophisticated, typically involving false IDs and aliases, multiple shell companies, a network of co-conspirators, and layers of transactions to launder the illicit fraud proceeds.   Between the two conspiracies, the defendant participated in schemes targeting 10 victims and more than $7.8 million in stolen checks and BEC schemes, leading to hundreds of thousands of dollars in victim losses.   In some cases, the banks were able to catch the schemes in time or claw back funds.   But even where victims were made whole, they were still required to expend time and effort to sort out the fraudulent payments, deal with vendors and business partners, and/or invest in precautionary measures to prevent future victimization.   The elaborate planning needed for any one scheme to work—not to mention the defendant's decision to work with not one but two separate co-conspirators—shows that the defendant made a conscious decision to engage in criminal activity.   It was only after she was caught red-handed by MPD that she finally ceased her criminal activity.

That said, and without diminishing the seriousness of her offenses, she did not act alone. The defendant was initially recruited into this criminal world by CO-CONSPIRATOR 2, and only

after she had begun working with CO-CONSPIRATOR 2 did she agree to work with Orji.   The defendant played the riskiest role in these schemes—as the one who had to physically enter banks to present false IDs, open accounts, and deposit and launder fraudulent checks—while her co-conspirators, CO-CONSPIRATOR 2 and Orji, directed her from the shadows.   Her co-conspirators provided her with access to the stolen check and BEC proceeds, false IDs, and instructions on how to register sham corporations and launder money.   The defendant was certainly a willing participant and bears full responsibility for her actions, but she was a lower-level participant and did not orchestrate the schemes on her own.

Finally, while the actions of the defendant and her co-conspirators caused significant financial harm to numerous victims, she herself retained only a fraction of the criminal profits while her upstream co-conspirators, including CO-CONSPIRATOR 2 and Orji and those above them, collected the lion's share.

### B.  The History and Characteristics of the Defendant

The defendant has minimal criminal history.   Other than the schemes charged in this case, her only other conviction was from a 2013 incident in which she was convicted of Theft of Less than $100, a misdemeanor under Maryland law for which she was sentenced to one year of probation.   *See* PSR ¶ 99, Md. Code Ann., Crim. Law § 7-104(g)(3).   The defendant's participation in the charged schemes reflects a troubling escalation in criminal activity. ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████ The government believes recidivism is not a significant concern in this case.

The defendant was undoubtedly motivated to cooperate with CO-CONSPIRATOR 2 and Orji out of a desire to make easy money. Nevertheless, she has a record of productive employment, and will be self-employed at the time of sentencing. *See* PSR ¶¶ 122-31. It does not appear that she ever relied on criminal activity for her principal livelihood.

### C. The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, To Promote Respect for the Law, To Provide Just Punishment; To Afford Adequate Deterrence; and To Protect the Public from Further Crimes of the Defendant

The defendant's fraud and money laundering offenses were serious, sophisticated, and deliberate. General deterrence is a "crucial factor in sentencing decisions for economic" crimes. *United States v. Morgan*, No. 13-6025, 635 F. App'x 423, 450 (10th Cir. Nov. 6, 2015) (unpublished). The legislative history of section 3553 documents Congress's emphasis on general deterrence in white-collar crime. *See* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 (need to deter others is "particularly important in the area of white collar crime"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations and citation omitted).



Specific deterrence is not a significant factor given the defendant's early acceptance of responsibility ████████████████ her clean record for more than four years, and her continued efforts to turn her life around and maintain productive employment since her arrest.

### D.  The Need To Avoid Unwarranted Sentencing Disparities

The Sentencing Guidelines usually provide the best guidepost for avoiding unwarranted sentencing disparities.  *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.").

In fashioning an appropriate sentence, this Court should consider two different reference points.   First, it should consider the sentence imposed in the related case against Michael Orji, one of the defendant's upstream co-conspirators.   Orji received a sentence of 120 months of imprisonment following a plea to bank fraud and money laundering conspiracies arising out of $5.7 million in stolen check and BEC schemes (including one scheme overlapping with the defendant).   Orji was a higher-level defendant who organized the schemes and directed lower-level participants, including the defendant, and procured false IDs, stolen checks, and other necessary implements on their behalf.   In light of the defendant's lower level of culpability ████ ████████████████████████ it would not create an unwarranted sentencing disparity to impose a substantially lower sentence here.

24



**E.  The Need To Provide Restitution**

Restitution is an important factor in this case.    Although many of the victims were able to avoid out-of-pocket losses, three of them suffered direct financial harm from the defendant's actions.    The government asks for a restitution judgment in the total amount of $550,136.54, as follows:

- $70,392.64 payable to Denver Public Schools, 1860 Lincoln Street, 11th Floor , Denver, CO 80203, to be imposed jointly and severally with the same restitution obligation in *United States v. Michael Afram Orji*, D.D.C. No. 18-cr-68.

---

[5] In ▆▆▆▆▆▆▆▆ case, the Court found that the defendant's Guidelines calculation properly included a 2-level enhancement pursuant to § 2B1.1(b)(11)(C)(i) for using any means of identification to produce or obtain any other means of identification, as well as a 2-level enhancement pursuant to § 2B1.1(b)(10) for use of sophisticated means.   The Court, however, granted a 2-level downward departure pursuant to § 2B1.1, Application Note 21, on the ground that, under the facts of the case, the two enhancements addressed the same underlying offense conduct.

- $239,871.95 payable to QuikTrip, P.O. Box 3475, Tulsa, Oklahoma 74101.
- $239,871.95 payable to Haskell Construction, 14000 Quail Springs Parkway, Ste. 500, Oklahoma City, OK 73134.

The defendant is currently employed and will be better able to fulfill her restitution obligations with a minimal sentence.

## II. Forfeiture

In general, "[m]oney laundering forfeiture pursuant to § 982(a)(1) applies to a larger class of property than proceeds forfeiture." *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012). Property involved in a money laundering offense includes "the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal citation omitted). For a money laundering conspiracy, the forfeiture encompasses all funds that the co-conspirators agreed to launder. *See United States v. Coffman*, 859 F. Supp. 2d 871, 879 (E.D. Ky. 2012) ("[T]he conspiracy to commit money laundering conviction . . . is not based on or limited to specific transactions, but encompasses the whole of Coffman's scheme and his attempts and plans to conceal and disguise the nature, location, source, ownership and control of the proceeds of the fraud.").

In the Plea Agreement and the Consent Preliminary Order of Forfeiture entered at the time of the defendant's plea, the defendant agreed to forfeit any property, real or personal, involved in the charged money laundering conspiracy offenses, pursuant to 18 U.S.C. § 982(a)(1). The defendant further agreed to the entry of a forfeiture money judgment in the amount of $532,250.04. This amount represents the total value of funds from victims of stolen check or BEC schemes that

were successfully deposited into accounts controlled by the defendant.[6]   *See* Statement of Offense, ¶ 65.

Pursuant to Fed. R. Crim. P. 32.2(b)(4)(A) and paragraph 4 of the Preliminary Consent Order of Forfeiture, the preliminary order becomes final as to the defendant at sentencing and shall be made part of the sentence and included in the judgment.

### III. Motion for Downward Departure and Sentencing Recommendation



---

[6]   Specifically, the forfeiture money judgment accounts for criminal proceeds obtained from VICTIM 1 (two checks totaling $178,951.57 derived from BEC scheme), *see* Statement of Offense, ¶¶ 13, 19; VICTIM 4 (stolen check in the amount of $23,308.84, *id.* ¶ 32; VICTIM 5 (check in the amount of $163,288.52 derived from BEC scheme, deposited into SWA Balsley account), *id.* ¶¶ 42, 47 (not that the Statement of Offense contains a typographical error in ¶ 42 listing the amount of deposit as $164,288.52; the correct amount was $163,288.52 and is accurately presented in the table at ¶ 47 and in the forfeiture money judgment); VICTIM 6 (stolen check in the amount of $62,002.56), *id.* ¶ 46; VICTIM 7 (stolen check in the amount of $14,529.90), *id.* ¶ 49; VICTIM 8 (stolen check in the amount of $21,548.31), *id.* ¶ 50; VICTIM 9 (stolen check in the amount of $43,370.34), *id.* ¶ 53; and VICTIM 10 (stolen check in the amount of $25,250.00), *id.* ¶ 56.   The forfeiture money judgment does not include the $102,672.86 check derived from the BEC scheme targeting VICTIM 5 which was deposited into the International Paper account, immediately frozen, and subsequently seized and recovered by law enforcement.

The government recommends a departure of approximately 50 percent, to offense level 14, and the imposition of a sentence at the lower bound of the resulting Guideline range of 15-21 months, *i.e.*, 15 months of imprisonment. ████████████████ and given significant financial penalties that the defendant will bear in addition to any custodial sentence—in the form of restitution, forfeiture, and possible fines—the government believes the recommended sentence is sufficient and would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a).

## **CONCLUSION**

For the foregoing reasons, the information reflected in the PSR, and the record in this case, the United States respectfully requests that the defendant be sentenced to a period of 15 months of imprisonment to be followed by 3 years of supervised release, imposition of a restitution judgment in the amount of $550,136.54, and entry of the Consent Preliminary Order of Forfeiture and imposition of a forfeiture money judgment in the amount of $532,250.04.

28

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:     */s/ Christopher B. Brown*
        Christopher B. Brown, D.C. Bar No. 1008763
        Assistant United States Attorney
        U.S. Attorney's Office for the District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-7153
        Christopher.Brown6@usdoj.gov

## CERTIFICATE OF SERVICE

On this 5th day of January, 2024, a copy of the foregoing was served upon counsel for the defendant, Nikki Lotze.

*/s/ Christopher B. Brown*
Christopher B. Brown
Assistant United States Attorney

29